COMMONWEALTH of Pennsylvania,
Appellee

v.

Stephen FOGLIA, Appellant.

Superior Court of Pennsylvania.

Argued Feb. 12, 2009.

Filed July 21, 2009.

Peter A. Levin, Philadelphia, for appellant.

Andrea Johnson, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J., and STEVENS, ORIE MELVIN, LALLY–GREEN, KLEIN, BOWES, PANELLA, DONOHUE and SHOGAN, JJ.

OPINION BY BOWES, J.:

¶ 1 On appeal, Stephen Foglia challenges the constitutionality of a police interdiction that led to the discovery of his possession of an unlicensed firearm. We affirm.

¶ 2 On June 24, 2006, Appellant was arrested for carrying an unlicensed firearm and carrying a firearm on a public street in Philadelphia. Appellant subsequently filed a motion to suppress the firearm as resulting from an illegal police detention. A hearing was held on that motion on December 18, 2006, and Philadelphia Police Officer Cyprian Scott, a seventeen-year veteran of the police force assigned to the SWAT team for thirteen of those years, testified as follows. At approximately 2:40 a.m. on June 24, 2006, he and his partner, Officer Inocencio Amaro, were in uniform patrolling the 25th district, a "high crime" area due to the "high

flow of narcotics and weapons." N.T. Trial (Waiver), 12/18/06, at 5, 6.

¶ 3 Officer Scott received a radio broadcast emanating from an anonymous source that there was a man "standing on the corner of 'A' and Westmoreland dressed in dark clothing, black clothing, carrying a firearm." *Id.* at 6. In less than "a minute and a half," the two police officers arrived "on the corner" referenced in the broadcast. *Id.* at 7. At the noted location, Officer Scott observed "two males," Appellant, who was clothed entirely in black, and one other man, who was wearing a dark gray suit. *Id.* at 8.

¶ 4 In order to avoid detection, Officers Scott and Amaro had entered "A" Street with their lights extinguished. When Appellant and his companion saw the officers, they "began walking away" from the cruiser heading east on Westmoreland. *Id.* Officer Scott continued to watch Appellant, who "looked back several times" and "kept walking" in the opposite direction of the police. *Id.* at 9.

¶ 5 The two officers stopped their vehicle and exited it. At that point, Appellant "grabbed around his waist area" and "sat on some steps behind two females." *Id.* Officer Scott was particularly wary of the fact that Appellant touched his waistband because the call indicated that there was an armed man and "people usually [are] carrying weapons in their waistband." *Id.* at 9. Since he was investigating a possible weapons offense, Officer Scott was making "sure to pay particular attention" to the "hands" and "waistband." *Id.* at 9–10.

¶ 6 At that point, Officer Scott ordered Appellant to stand, informed him that he was investigating a "male with a gun that fit his description," and immediately patted down Appellant. *Id.* at 10. Officer Scott felt the handle of a gun in Appellant's waistband and retrieved the weapon. In response to questioning, Appellant admitted that he did not have a permit to carry the firearm, and he was arrested.

¶ 7 The trial court denied the motion to suppress and after a colloquy, Appellant agreed to immediately proceed to a nonjury trial. Officer Scott then testified that he recovered a loaded .40–caliber Glock pistol in Appellant's waistband. A stipulation was entered that the gun was tested and found to be operable. The Commonwealth then admitted into evidence a certificate of non-licensure indicating that Appellant did not have a license to carry a firearm. Appellant was adjudged guilty of carrying an unlicensed firearm, 18 Pa.C.S. § 6106, and carrying a firearm on public property in Philadelphia, 18 Pa.C.S. § 6108. The court ordered a presentence report.

¶ 8 Prior to sentencing, Appellant filed a petition for extraordinary relief charging suppression counsel with ineffectiveness for failing to conduct adequate cross-examination of Officer Scott. On May 31, 2007, the court held a hearing on that petition. Appellant, who was represented by new counsel, presented suppression counsel as a witness. Suppression counsel testified that he believed that he was ineffective for failing to sufficiently cross-examine Officer Scott and that adequate questioning of Officer Scott would have revealed that he did not see Appellant grab his waistband until after the stop had occurred. N.T. Motion and Sentencing, 5/31/07, at 6. Suppression counsel relied upon the contents of the police report detailing Appellant's arrest.

¶ 9 The trial court denied relief on the basis that trial counsel had a reasonable strategy for pursuing the suppression issue in the manner that he did and also on the ground that the error or omission would not have resulted in a different outcome at the suppression hearing. *Id.* at 35. The case immediately proceeded to sentencing, and the court imposed a guide-

line sentence of eleven and one-half to twenty-three months imprisonment with a consecutive two-year probationary term and noted Appellant's eligibility for work release. This timely appeal followed.[1]

■■ ¶ 10 We set forth our standard of review:

When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. *Commonwealth v. Davis*, 491 Pa. 363, 421 A.2d 179 (1980). Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 842 (2003). However, where the appeal of the determination of the suppression court turns on allegations of legal error, "the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts." *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 881 (1998).

*Commonwealth v. Kemp*, 961 A.2d 1247, 1252–1253 (Pa.Super.2008) (en banc) (quoting *Commonwealth v. Mistler*, 590 Pa. 390, 912 A.2d 1265, 1269–70 (2006)).

■ ¶ 11 In this case, Appellant assails the suppression court's conclusion that Officer Scott had reasonable suspicion that Appellant was engaging in the criminal activity of carrying a firearm and that Officer Scott was therefore justified in conducting a patdown search for weapons.

■ ¶ 12 It is settled that:

A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. *Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 676 (1999). "This standard, less stringent than probable cause, is commonly known as reasonable suspicion." *Id.* In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163 (2001). In making this determination, we must give "due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience." *Cook*, 735 A.2d at 676 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, "even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Cook*, 735 A.2d at 676.

*Kemp, supra* at 1255 (quoting *Commonwealth v. Rogers*, 578 Pa. 127, 849 A.2d 1185, 1189 (2004)).

■ ¶ 13 Police cannot initiate a detention based solely upon an anonymous tip that a person matching the defendant's description in a specified location is carrying a gun. *In Interest of D.M.*, 566 Pa. 445, 781 A.2d 1161 (2001). However, if the person described by the tipster engages in other suspicious behavior, such as flight, reasonable suspicion justifying an investigatory detention is present. *Id.* (applying *Illinois v. Wardlow*, 528 U.S. 119, 120

---

1. A panel of this Court, with this author dissenting, initially vacated Appellant's sentence.

We subsequently granted the Commonwealth *en banc* review of the panel decision.

S.Ct. 673, 145 L.Ed.2d 570 (2000)).[2] Evasive behavior also is relevant in the reasonable-suspicion mix. *Wardlow, supra; accord Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903, 908 (2000) ("nervous, evasive behavior such as flight is a pertinent factor in determining reasonable suspicion"). Moreover, whether the defendant was located in a high crime area similarly supports the existence of reasonable suspicion. *Wardlow, supra.* Finally, if a suspect engages in hand movements that police know, based on their experience, are associated with the secreting of a weapon, those movements will buttress the legitimacy of a protective weapons search of the location where the hand movements occurred. *In Interest of O.J.,* 958 A.2d 561 (Pa.Super.2008) (*en banc* ).

¶ 14 In this case, a seventeen-year veteran of the police force and member of the SWAT team was patrolling in an area that had a high volume of drugs and weapons. He received an anonymous tip that a man dressed in black possessed a weapon at a given location. Upon immediately proceeding to that site, the police officer observed two men, one of whom was attired entirely in black. That man began to engage in evasive behavior by continually looking back at police and walking away from them. He touched his waist area and sat down on a stoop behind some females. The police officer was aware, based upon his experience with armed suspects, that weapons are often concealed in a person's waistband. Thus, Officer Scott had more than ample facts at his disposal to believe that Appellant was armed with a gun.

¶ 15 Since the criminal activity in question involved possession of a firearm and since Appellant's act of patting his waistband bolstered Officer Scott's reasonable belief that Appellant actually had a gun in his pants, Officer Scott was constitutionally permitted to conduct a patdown search of Appellant's waistband. *In the Interest of O.J., supra.* The suppression court's factual findings are supported by the record, and its legal conclusions are unassailable; hence, we must affirm.

¶ 16 Appellant also maintains that Officer Scott was not permitted to rely upon the fact that Appellant grabbed his waistband in assessing whether reasonable suspicion existed because Officer Scott indicated at the suppression hearing that he intended to stop Appellant before he observed that behavior. *See* N.T. Trial (Waiver), 12/18/06, at 15. However, reasonable suspicion is based upon an objective standard, not subjective intent. As the United States Supreme Court noted in *Maryland v. Macon,* 472 U.S. 463, 470–471, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985), "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1722, 56 L.Ed.2d 168 (1978), and not on the officer's actual state of mind at the time the challenged action was taken. *Id.* at 138, 139, n. 13, 98 S.Ct. at 1724, n. 13."

¶ 17 In this case, Officer Scott was properly discharging his duties when he was investigating the veracity of the anonymous tip. Appellant was wearing black clothing and was located on the corner identified by that source. Officer Scott was patrolling an area known for drugs and guns. Upon viewing the police officer, Appellant engaged in evasive behavior. Finally, Appellant displayed hand movements consistent with custody of a weapon in his waistband, where such items are

---

**2.** In the present case, Appellant relies upon *Commonwealth v. Lynch,* 773 A.2d 1240 (Pa.Super.2001), which was overruled by *In the Interest of D.M.*

commonly hidden. As this latter action occurred before the patdown, it can be used to support the officer's actions.

▇ ¶ 18 Finally, Appellant argues that the trial court incorrectly concluded that his suppression counsel was not ineffective.[3] He maintains that suppression counsel was ineffective for failing to cross-examine Officer Scott with a statement attributed to him in a police report that was drafted by Detective James Perfidio. Appellant claims that in the report, Officer Scott admitted that Appellant did not reach for his waistband until after police stopped him. The police report reads as follows:

**FACTS OF THE CASE:**

On 6/24/06 at approx. 2:40AM P/O Amaro # 3346 and P/O Scott # 6689 were working as S–102 when they responded to a person with a gun call at A and Westmoreland St. Upon arrival the officers received flash information of a male wearing all black clothing. The officers observed two males, one wearing all black clothing (def) and a second male wearing a dark grey dickie outfit. Both males were observed walking eastbound on Westmoreland St. to Ella Street then northbound on Ella Street. Both males were stopped. The officers observed the defendant reaching towards the front of his pants. The officers conducted a pat down on the males. Recovered from the defendant was a Glock model # 23 semi auto pistol serial number HVW251 loaded with twelve (12) rounds in the magazine and one (1) round in the chamber. The officers placed the defendant in custody and transported him to EDD. The male could not produce a valid permit to car-

ry. The weapon was placed on property receipt number 2662868.

The assigned conducted an NCIC/PCIC check for a permit to carry/negative results.

Police Department Arrest Report at 1.

¶ 19 This report obviously was a cursory outline of the facts pertinent to the interdiction and does not even list the events in chronological order. This latter conclusion is reinforced by the fact that the report indicates that the flash broadcast occurred at two different time periods, before the police left for A and Westmoreland Streets and after they arrived at that location. The report does not describe Appellant as continually looking back at the two officers and does not state that he sat down behind two women.

¶ 20 Furthermore, the report indicates that Appellant was stopped, reached for his waistband, and then was searched. Officer Scott testified at the suppression hearing that he was approaching Appellant when he saw Appellant reach for his waistband just prior to sitting on the steps; once he reached Appellant, he conducted the patdown. Analyzed properly, the report appears to be nothing more than an indication that the officer was under the impression that he was engaging in a "stop" while he was traveling toward Appellant. However, police may approach a person and such action does not constitute a seizure under the Constitution. *In the Interest of D.M., supra.* Rather, a constitutional seizure does not occur until police actually effectuate the stop. *Id.* The characterization of Officer Scott's approach of Appellant as a "stop" is not binding on this Court's constitutional analysis. Thus, we

---

**3.** Since this issue of ineffectiveness was developed at an evidentiary hearing and addressed by the trial court, it can be reviewed in this direct appeal. *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003); *see also Commonwealth v. Moore,* 594 Pa. 619, 937 A.2d 1062 (2007).

concur with the trial court's conclusion that suppression counsel was not ineffective for failing to utilize the contents of the police report for impeachment purposes.

¶ 21 Judgment of sentence affirmed.

¶ 22 President Judge FORD ELLIOTT Concurs in the Result.

¶ 23 Judge DONOHUE files a Dissenting Opinion.

### DISSENTING OPINION BY DONOHUE, J.:

¶ 1 Based upon my review of the record, I would agree with the learned Majority's conclusion that Officer Scott had reasonable suspicion that Appellant Stephen Foglia ("Foglia") was engaging in criminal conduct and was therefore justified in initiating an investigative detention to conduct a pat-down search for weapons *if* the suppression court's finding of fact that Foglia "grabbed around his waist area" *prior* to the stop was based on testimony that was illuminated by cross-examination. Since this was not the case and Foglia's suppression court counsel admitted he had no strategy for failing to test this evidence against a patently contradictory police report, I would reverse the decision of the trial court.

¶ 2 In my view, Officer Scott's testimony regarding the timing of Foglia's movement of his hands towards his waistband is the crucial evidence supporting the investigative detention and pat down in this case. The Majority acknowledges that the officers in this case were not justified in conducting an investigatory detention merely based upon an anonymous tip that a person matching Foglia's description was in a specified location carrying a gun. *In the Interest of D.M.*, 566 Pa. 445, 450–51, 781 A.2d 1161, 1164 (2001). Thus, the Majority relies primarily on Foglia's "evasive behavior" and furtive hand movements to support the validity of the investigatory detention.[1]

¶ 3 First, the record in this case does not support a finding of "evasive behavior" and the suppression court did not make any such finding. Officer Scott testified that when Foglia saw the officers, Foglia and his companion merely "began walking away," looked back at the officers, and sat down on some steps behind two females. N.T., 12/18/06, at 8–9. Such benign conduct does not constitute "evasive behavior," particularly since the officers never even asked him to stop. In the two principal cases cited by the Majority on this point, both our Supreme Court and the United States Supreme Court concluded that the defendants had generated reasonable suspicion through their unprovoked flight from the scene. *D.M.*, 566 Pa. at 451, 781 A.2d at 1164 ("as the police officer approached appellant, he turned and fled the scene"); *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). In contrast, when a police officer approaches an individual without reasonable suspicion or probable cause to detain him, the individual has a right to ignore the police and go about his business. *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In my view, Foglia's walking

---

1. The Majority also notes that the stop occurred in a high crime area. An individual's mere presence in an area of expected criminal activity, standing alone, however, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. *Commonwealth* v. *Kearney*, 411 Pa.Super. 274, 601 A.2d 346, 348 (1992); *Commonwealth v. Williams*, 287 Pa.Super. 19, 429 A.2d 698, 703 n. 9 (1981); *see also Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

away from police officers and sitting down on steps constituted nothing more than "going about his business".

¶ 4 From my perspective, only the suppression court's finding of fact that Officer Scott observed Foglia "grabb[ing] around his waist area" before the detention occurred salvages reasonable suspicion in this case. Although such a furtive movement, by itself, would not support an investigatory detention, *see, e.g., Commonwealth v. Reppert*, 814 A.2d 1196, 1205 (Pa.Super.2002) ("neither furtive movements nor excessive nervousness provide a sufficient basis upon which to conduct an investigatory detention"), because here the officers were investigating an anonymous report of a man in black clothing with a gun, and because Officer Scott testified that Foglia's furtive hand movement at the waistband of the pants was consistent with someone carrying a gun (thus potentially indicative of a criminal purpose and buttressing the anonymous tip), one could infer that Officer Scott had reasonable suspicion that Foglia was carrying a weapon. *See In the Interest of O.J.*, 958 A.2d 561, 566 (Pa.Super.2008) (*en banc* ).

¶ 5 On the crucial issue of the timing of the furtive movement, Foglia argues that his suppression counsel was ineffective for failing to cross-examine Officer Scott on inconsistencies between the police report of the incident and his testimony at the suppression hearing, including that the police report places the furtive hand movement *after* the stop, in contradiction of the officer's testimony. (Appellant's Brief at 14). I believe Foglia's ineffective assistance of counsel claim is meritorious and thus dissent from the Majority.

¶ 6 The police report provides as follows:
**FACTS OF THE CASE:**
On 6/24/06 at approx. 2:40AM P/O Amaro # 3346 and P/O Scott # 6689 were working as S–102 when they re-sponded to a person with a gun call at A and Westmoreland St. Upon arrival the officers received flash information of a male wearing all black clothing. The officers observed two males, one wearing all black clothing (def) and a second male wearing a dark grey dickie outfit. Both males were observed walking east-bound on Westmoreland St. to Ella Street then northbound on Ella Street. Both males were stopped. The officers observed the defendant reaching towards the front of his pants. The officers conducted a pat down on the males. Recovered from the defendant was a Glock model # 23 semi auto pistol serial number HVW251 loaded with twelve (12) rounds in the magazine and one (1) round in the chamber. The officers placed the defendant in custody and transported him to EDD. The male could not produce a valid permit to carry. The weapon was placed on property receipt number 2662868.

The assigned conducted an NCIC/PCIC check for a permit to carry/negative results.

Police Department Arrest Report at 1.

¶ 7 This police report differs significantly from Officer Scott's testimony at the suppression hearing. The police report indicates that the officers stopped Foglia *before* he reached for the front of his pants. In contrast, Officer Scott testified that the detention occurred *after* Foglia reached for his waistband. N.T., 12/18/06, at 9–10.

¶ 8 To prove ineffectiveness of counsel, an appellant must demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel's performance lacked a reasonable basis; and (3) the ineffectiveness of counsel caused him prejudice. *Commonwealth v. Williams*, 587 Pa. 304, 311, 899 A.2d 1060, 1063 (2006) (citing *Common-*

*wealth v. Pierce,* 567 Pa. 186, 786 A.2d 203 (2001)).

¶ 9 The first prong of this test is clearly satisfied here, as Foglia's counsel did not cross-examine Officer Scott *at all* at the suppression hearing on the inconsistencies between his testimony and that of the police report. In fact, at the suppression hearing, counsel did not introduce the police report into evidence or even disclose its existence. N.T., 12/18/06, at 12–15. The record on appeal contains no indication that the suppression court had any knowledge that a written police report of the incident in question even existed when it denied Foglia's motion to suppress. Our Supreme Court has repeatedly emphasized that the accused has a right to cross-examine prosecution witnesses, and that this right is especially important when there are conflicting versions of the evidence. *Commonwealth v. Cox,* 556 Pa. 368, 388–89, 728 A.2d 923, 933 (1999); *Commonwealth v. Birch,* 532 Pa. 563, 565, 616 A.2d 977, 978 (1992). In this case, Officer Scott was the prosecution's sole witness at the suppression hearing, and the Commonwealth's case on Foglia's motion to suppress depended entirely on Officer Scott's testimony and his credibility.

¶ 10 The second prong of the ineffectiveness test, whether counsel had a reasonable and strategic basis for his actions, is also resolved in Foglia's favor here. At the evidentiary hearing on Foglia's Petition for Extraordinary Relief, Foglia's counsel straightforwardly admitted his lack of any strategic purpose:

Q. Mr. Farrell, in your motion it states at the motion to suppress you completed your cross-examination of the

officer based upon your mis-evaluation of the law; is that correct?

\* \* \*

A. ... I overlooked cross-examining the officer with the prior inaccuracies to bring to the court's attention that the officer embellished observations to get him constitutionally closer to an appropriate reasonable articulable stop.

\* \* \*

Q. Mr. Farrell, counsel pointed out that you received discovery from the district attorney. Your failing to question the officer during the motion, that was not a strategic decision you made based upon the evidence that you had observed, correct?

A. Correct. I simply neglected to do what I should have done with respect to that discovery.

N.T., 5/31/07, at 15–17.

¶ 11 In its Rule 1925(a) opinion, the trial court indicated that it denied the Petition for Extraordinary Relief because Foglia's counsel made two strategic decisions: (1) that the crucial question was whether the officers had the right to recover the gun from Foglia, and (2) to proceed immediately with the waiver trial after the suppression motion was denied. Trial Court Opinion, 10/3/07, at 8. Neither of these "strategic decisions," however, constitutes any reasonable basis for failing to cross-examine the Commonwealth's sole witness on dispositive issues of fact at the suppression hearing. As counsel himself admitted, he simply failed to do what was required of him at the suppression hearing, and he had no strategic reason for failing to do so.[2]

2. Foglia's counsel attempted to correct his errors at the bench trial immediately following the suppression hearing, including by introducing the police report and attempting to

cross-examine Officer Scott about its contents. N.T., 12/18/06, at 32–24. The Commonwealth objected and because the motion to suppress had already been denied, the trial

¶ 12 Finally, with respect to the third prong (prejudice), Foglia had the burden to prove, by a preponderance of the evidence, that there is "a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceedings would have been different." *Commonwealth v. Gibson*, 597 Pa. 402, 418, 951 A.2d 1110, 1120 (2008). The trial court found that Foglia had not met his burden on this prong of the ineffectiveness test. Specifically, the trial court concluded that it would be speculative to predict a different result since "it's always an issue of credibility and *it could have gone either way* as I see it in this case." N.T., 5/31/07, at 35 (emphasis added).

¶ 13 In my view, "it could have gone either way" constitutes a *reasonable probability* of a contrary result. Our Supreme Court has defined "reasonable probability" in this context as "a probability sufficient to undermine confidence in the outcome." *Gibson*, 597 Pa. at 418, 951 A.2d at 1120 (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). When a trial court straightforwardly admits that the chances are equally strong that its decision would have been different after considering all of the available evidence, such a finding clearly undermines confidence in the outcome of the suppression hearing.

¶ 14 This is particularly true when the fate of Foglia's motion to suppress depended entirely on the testimony of a single witness (Officer Scott) on a single issue (whether Foglia reached for the waistband of his pants *before* he was stopped). If Foglia reached for his waistband *after* the investigative detention occurred, as the police report states, then the factual basis for reasonable suspicion disappears—as the evidence would demonstrate that the officers detained Foglia based solely on an anonymous tip that a person, in a specified location in a area known for crime, matching a very general description of Foglia,[3] was carrying a gun. This level of information is insufficient to satisfy reasonable suspicion. *In the Interest of D.M.*, 566 Pa. at 450–51, 781 A.2d at 1164. As a result, Officer Scott's testimony on this point was crucial—and thus it should have been subjected to thorough cross-examination to provide the suppression court with a full and fair opportunity to assess his credibility. *See, e.g., Commonwealth v. Davis*, 438 Pa.Super. 425, 652 A.2d 885, 888 (1995) (where the testimony of a single prosecution witness was determinative of defendant's guilt or innocence, counsel's failure to cross-examine that witness as to potential bias constituted prejudice).[4]

¶ 15 Moreover, there is good reason to believe that cross-examination of Officer Scott in this case had a reasonable opportunity for success. Among other things, at trial Officer Scott confirmed that the police report contained his own statement of events, which he provided to Detective James Perfidio (who then prepared the report).[5] As such, the discrepancies be-

---

court granted the objection and ruled that the questions were irrelevant. *Id.* at 34.

3. Officer Scott testified that the description of the man carrying a gun was limited to black clothing, and contained no details such as race, height, or size. N.T., 12/18/06, at 12.

4. In contrast, when the testimony of a witness is bolstered or corroborated by the testimony of other witnesses or evidence, a failure to

cross-examine has generally been found to be harmless and thus not prejudicial. *See, e.g., Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 801 (2008); *Commonwealth v. Dennis*, 597 Pa. 159, 183, 950 A.2d 945, 959 (2008).

5. At the bench trial, Officer Scott testified as follows:

Q. You prepared the [police report] in this case, didn't you?

tween the report and the subsequent testimony immediately call into question how Officer Scott's recollection of the details six months after the incident was more accurate that his own description of the same incident in the police report prepared *the next day* after it occurred.[6] Moreover, a strong argument can be made for the reliability of the sequence of events memorialized in the nearly contemporaneous police report, since Officer Scott testified that the sequence of events was not of any particular significance to him on the night in question, as he had already decided to effectuate a stop even before he observed Foglia reach for his waistband. N.T., 12/18/06, at 15. Finally, Foglia's counsel at the suppression hearing could have cross-examined Officer Scott on his preparation to testify, including whether he was shown the police report in advance of his testimony to refresh his recollection. Even the most rudimentary cross-examination would have highlighted the point made by Foglia's suppression counsel in his subsequent testimony, namely that Officer Scott's testimony, in contrast to the police report, was "constitutionally closer to an appropriate reasonable articulable stop." N.T., 5/31/07, at 15.

¶ 16 Whether competent cross-examination of Officer Scott on the contents of the police report would have produced a different result here is unknown, but the failure to cross-examine by suppression counsel unquestionably prejudiced Foglia and undermined confidence in the outcome of the hearing. The Majority's speculation to the contrary has no support whatsoever in the record on appeal. The Majority claims

that the police report is "merely a cursory outline of the facts pertinent to the interdiction and does not even list the events in chronological order." How does the Majority know this was a cursory outline since there is no evidence in the record to support such a conclusion? Even more puzzling is the Majority's conclusion that the report was not intended to contain a chronological account of the events on the night in question. On its face, the police report certainly appears to be chronological in nature, as it begins at the beginning (the anonymous tip) and ends at the end (Foglia's arrest and confiscation of his weapon). There is simply nothing in the record on appeal to demonstrate (or even suggest) that the description of the intermediate events are in any order other than chronological (or what such an alternative order of events might be). With the text as our only guide, the police report unambiguously states that *first* Foglia was stopped and *then* he reached for his waistband.

¶ 17 The Majority also concludes that the police report does not really mean what it says—*i.e.*, that the statement in the report that "Both males were stopped" does not really mean that Foglia and his companion were stopped, but rather merely that the officers were traveling towards Foglia and his companion. According to the Majority, "[a]nalyzed properly, the report appears to be nothing more than an indication that the officer was under the impression that he was engaged in a 'stop' while he was traveling toward [Foglia]." Again, however, the record on appeal con-

A. No.
Q. You spoke to the detective who prepared it?
A. Yes.
Q. Showing you the [police report] ... in front of you, you see the section prepared *reflecting your statement to the detective?*

A. Yes.
N.T., 12/18/06, at 32 (emphasis added).

**6.** The incident occurred on June 24, 2006, the police report is dated June 25, 2006, and Officer Scott testified on December 18, 2006.

tains no evidence to support such speculation.

¶ 18 Despite the Majority's attempts to explain away the inconsistencies between Officer Scott's testimony and the written police report of the incident, nothing in the record on appeal before us can reconcile the stark differences between the two. Foglia's suppression counsel had an obligation to cross-examine Officer Scott in an attempt to discredit his recollection of events on the night in question, particularly on the dispositive issue of whether Foglia reached for the waistband of his pants before or after the initiation of the investigative detention. As counsel himself now admits, he failed to do so. This mistake prejudiced Foglia, as cross-examination might well have tipped the balance at the suppression hearing in his favor.

¶ 19 For these reasons, I would find that Foglia has satisfied all three prongs of the test for ineffective assistance of counsel. As a result, I respectfully dissent.